UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 20-CV-542-JED-CDL ) |
| SELECT MANAGEMENT GROUP, LLC; MICHELLE BRADSHAW; MICHELLE BRADSHAW REALTY, LLC; KATHLEEN BARNES; BRUCE A MILLER; LYNNE R MILLER; | ) ) ) ) ) ) ) |
| Defendants. | ) |

**OPINION AND ORDER**

The Court has for its consideration the following motions: the Motion for Summary Judgment (Doc. 25) filed by Plaintiff American National Property and Casualty Company; the Motion to Defer Consideration of the Motion for Summary Judgment (Doc. 26) filed by Defendant Kathleen Barnes; and the Motion to Dismiss (Doc. 28) filed by Defendants Bruce and Lynne Miller.

**I.     Background**

This is a declaratory judgment action in which Plaintiff American National, an insurer, seeks a determination that it has no policy obligations related to tort claims filed by Defendant Kathleen Barnes in state court.

The underlying tort action arose from injuries Ms. Barnes, a realtor, suffered as she was showing clients a house for sale in Broken Arrow, Oklahoma. According to Ms. Barnes's petition, she was showing the clients the backyard when a dog, whose presence was not disclosed in the listing information, came around the side of the house and began to approach them. As she ran toward the back door, she tripped and broke her arm.

Ms. Barnes alleges her claims against two groups of defendants. Defendant Michelle Bradshaw was the listing agent on the sale and, according to the petition, was the employee/agent of Defendants Bradshaw Realty and Select Management during the period relevant to the suit. Defendants Bruce and Lynne Miller owned the house. The petition alleges negligence against the Millers and Ms. Bradshaw, and vicarious liability against Bradshaw Realty and Select Management.

Select Management had a general liability policy with American National that also covered its employees. Coverage, however, was subject to the following professional services exclusion:

> **1. Applicable to Business Liability Coverage**
>    This insurance does not apply to:
>       . . . .
> **j. Professional Services**
>    "Bodily injury", "property damage" or "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:
>      (1) Legal, accounting or advertising services;
>      (2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;
>      (3) Supervisory, inspection or engineering services;
>      (4) Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;
>      (5) Any health or therapeutic service treatment, advice or instruction;
>      (6) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;
>      (7) Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;
>      (8) Body piercing services; and
>      (9) Services in the practice of pharmacy.
>    This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering or failure to render of any professional service.

(Doc. 37-3 at 38, 41–42).

In addition to the liability coverage provided as part of the base policy, the parties agreed to an Employment Practices Liability Insurance Endorsement, which provided as follows:

> SECTION I. WHAT IS COVERED
> A. Insuring Agreement
>   1. "We" shall pay those "losses" arising out of an "insured's" "wrongful employment act" (other than a "third party violation") against "your" "employees", "recognized volunteers" and applicants for employment to which this insurance applies.
>       . . . .
> Section VII. Definitions
>       . . . .
> S. "Wrongful employment act(s)" means any actual or alleged:
>   1. Wrongful dismissal, discharge or termination (either actual or constructive), including breach of an implied contract;
>   2. Harassment or coercion (including sexual harassment, whether quid pro quo, hostile work environment or otherwise);
>   3. Discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);
>   4. "Retaliation" (including lockouts);
>   5. Employment-related misrepresentation(s) to "your" "employee" or applicant for employment with "you";
>   6. Employment-related libel, slander, humiliation, mental anguish, infliction of emotional distress, defamation, or invasion of privacy;
>   7. Wrongful failure to employ or promote;
>   8. Wrongful deprivation of career opportunity, wrongful demotion or negligent "employee" evaluation, including the giving of negative or defamatory statements in connection with an "employee" reference;
>   9. Wrongful discipline;
>   10. Failure to provide or enforce adequate or consistent corporate policies and procedures relating to any "wrongful employment act";
>   11. Negligent supervision or hiring by an "insured", relating to any of the above;
>   12. Violation of an individual's civil rights relating to any of the above; or
>   13. "Third party violations", but only if coverage for "third party violations" is shown on the Schedule of this endorsement.

(Doc. 37-2 at 4, 12).

American National moves for summary judgment on three issues. First, it contends that Ms. Barnes's claims against Ms. Bradshaw and her alleged employers (the Bradshaw Defendants) fall within the scope of the professional services exclusion. Second, the insurer argues that it owes no duties to the Bradshaw Defendants under the Employment Practices Endorsement because the

claims fall outside the endorsement's scope. And finally, American National argues that, even if coverage exists, it does not extend to any potential punitive damages.

## II. Discussion

Before advancing to the merits of American National's motion for summary judgment, the Court briefly addresses the Millers' Motion to Dismiss and Ms. Barnes's Motion to Defer Consideration of Summary Judgment.

### A. Motion to Dismiss

The Millers move to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, alleging the absence of subject matter jurisdiction. The Millers contend that they are not insureds or intended beneficiaries under the insurance policy and therefore have no interest in this litigation. Consequently, they say, there is no case or controversy between them and American National such that the Court can exercise subject matter jurisdiction. The Court agrees.

The Constitution limits the role of federal courts to the resolution of "cases" and "controversies." U.S. Const. art. III, § 2. This is a "bedrock requirement." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 471 (1982). The Declaratory Judgment Act permits courts to determine the legal rights of parties even if no party seeks relief beyond the declaration itself, but the requirement of an actual case or controversy remains. 28 U.S.C. § 2201; *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–41 (1937). And the party seeking the declaration bears the burden of establishing the existence of an actual case or controversy. *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993).

Whether the case-or-controversy requirement has been satisfied "comes down to 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment.'" *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th

Cir. 2011) (quoting, with added emphasis, *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941)).

The Millers cite several cases in which courts have held that, in an action to determine the obligations of an insurer with respect to an underlying tort action, an uninsured party's status as an alleged joint tortfeasor is not enough to establish a justiciable controversy. *See Essex Ins. Co. v. Sheppard & Sons Const., Inc.*, No. CIV-12-1022-D, 2015 WL 4251073, at *5–9 (W.D. Okla. July 13, 2015); *Pa. Mfrs. Indem. Co. v. Air Power, Inc.*, No. 1:13CV217, 2014 WL 1513966, *4–6 (M.D.N.C. Apr. 16, 2014); *Lott v. Scottsdale Ins. Co.*, 811 F. Supp. 2d 1224, 1230–32 (E.D. Va. 2011).

In *Essex Insurance Co.*, an insurance company brought a declaratory judgment action against its insured, a general contractor, that, along with its subcontractor, was being sued for the allegedly negligent construction of a commercial building. *Essex Ins. Co.,* 2015 WL 4251073, at *1. The subcontractor moved to dismiss on the grounds that there was no case or controversy between it and the insurance company since the general contractor was the only insured under the policy at issue.[1] The court granted the motion, holding that the subcontractor's potential interest in the outcome of the declaratory judgment action was too attenuated to create a justiciable controversy. *Id.* at *8.

In reaching its decision, the court reasoned that the justiciability issue was different with respect to the various defendants. Established precedent held that injured third parties (i.e., tort claimants) are proper parties to a declaratory judgment action even though their claims against the

---

1. The subcontractor styled its motion as one for summary judgment, but the district court held it was more properly treated as a motion to dismiss under Rule 12(b)(1). *Essex Ins. Co.*, WL 4251073, at *1 (citing *Goodman v. United States,* 185 Fed. Appx. 725, 727 (10th Cir.2006)).

insurer are contingent upon obtaining a judgment against the insured. *Essex Ins. Co.*, WL 4251073, at *4 (citing *Franklin Life Ins. Co. v. Johnson,* 157 F.2d 653, 658 (10th Cir.1946)). The same was true of insured tortfeasors, even though their claims depend on the outcome of the underlying action. *Id.* at *5 (discussing *Kunkel v. Continental Cas. Co.,* 866 F.2d 1269 (10th Cir.1989)). No such authority appeared to support the proposition that an uninsured third-party has a justiciable interest in the determination of a policy merely because the party is alleged to be a joint tortfeasor of the insured. Moreover, the court reasoned, where the proposition has been litigated, courts have rejected it. *See Essex*, 2015 WL 4251073, at *6–8 (discussing *Pa. Mfrs. Indem. Co.*, 2014 WL 1513966 and *Lott*, 811 F. Supp. 2d 1224). The court found *Lott* particularly persuasive.

The issue in *Lott* was the same as in *Essex*—and in the case now before the Court—but the positions of the parties were reversed. *See Lott*, 811 F.Supp.2d at 1227–28. That is, the insurance company denying coverage was defending against a declaratory judgment action brought by the tort claimants, the policy-holding tortfeasor, a joint tortfeasor, and the joint tortfeasor's insurer.

In *Lott*, the parents of a child who drowned at a swimming club brought a state court action against the club and the company it hired to manage its operations. The swim club's insurer accepted its duty to defend and indemnify its insured, but the management company's insurer denied coverage, leading the other parties to join in a declaratory judgment action against the management company's insurer.[2] In the suit, the plaintiffs sought a determination that the management company's insurer was obliged under its policy to defend and indemnify its insured. *Id.* at 1228. The defendant-insurer then moved to dismiss on the grounds that the plaintiffs lacked standing to seek the desired declaratory relief.

---

2. The management company was originally joined as a defendant, but the court later realigned it as a plaintiff, leaving the management company's insurer as the only defendant. *Lott*, 811 F.Supp.2d at 1228.

All agreed that the management company, as the tortfeasor insured under the policy at issue, was a proper party because the insurer's refusal to defend and indemnify it in the underlying suit was an injury-in-fact sufficient to establish Article III standing. *Lott*, 811 F. Supp. 2d at 1229. And, while the parties disputed whether the parents were proper parties, the court ruled that they were because the insurer's denial of coverage would injure them in the event that they obtained a judgment against the management company and the judgment went unsatisfied. *Id.* at 1231.

When it came to the swim club and its insurer, however, the court ruled that they were not proper parties, reasoning that, "[u]nlike a tort claimant, a joint tortfeasor's stake in the outcome of a coverage dispute between a different tortfeasor and that tortfeasor's insurer is generally too attenuated and remote to fall within Article III." *Id.* Even if the parents obtained a judgment against the management company, coverage under the policy would only be relevant to the club and its insurer if the club sought to recover contribution from the management company. *Id.* at 1231. In order for contribution to apply, several contingencies would have to play out. The parents would have to obtain a judgment, the judgment would have to be against both the club *and* the management company, and the club would have to pay more than its pro rata share of the judgment. Even then, only if the management company failed to pay its share would the insurer's refusal to indemnify cause any injury to the club or its insurer. Because the club and its insurer had no "dog in this insurance coverage hunt," the court held that they lacked standing to bring the suit. *Id.* at 1232.

The facts here raise precisely the same issue. Although it is undisputed that the Millers are neither insureds nor third-party beneficiaries under that policy, American National argues that they have a justiciable interest in the Court's interpretation of the policy. The company argues that "[t]here could be" some indemnification provision in the contract the Millers signed with

7

Bradshaw, so "[i]t is certainly possible" that the Millers could bring a crossclaim that puts the same policy provision at issue. (Doc. 36 at 5). Alternatively, American National argues that the Millers have an interest in the Court's coverage determination because "the amount of insurance coverage that is available for the underlying Civil Case most certainly impacts the Defendants named in that case." (*Id.*)

These are exactly the kind of hypothetical interests that the courts in *Essex* and *Lott* said were too attenuated to establish a justiciable controversy. Any potential crossclaim the Millers might have against Ms. Bradshaw in the underlying litigation is purely conjectural at this point. The listing agreement between the Millers and Ms. Bradshaw includes no indemnification clause, (*see* Doc. 40-4), so there are certainly no contractual grounds for such a suit. To the extent the Millers might have some other crossclaim to bring, American National has not explained what that would be or how its existence would give the Millers a justiciable interest in the outcome of this case.

Moreover, it is hard to see how the Millers would have a legal interest in the availability of insurance coverage for any damages awarded against Ms. Bradshaw or her alleged employers. As explained in *Lott*, a tortfeasor may develop an interest in an insurer's coverage of a judgment against his joint tortfeasor, but only if several contingencies align to bring the first tortfeasor's right of contribution into play. If such an interest was too attenuated to satisfy Article III in *Lott*, the interest is outright nonexistent in this case because Oklahoma has abolished joint liability, *see* Okla. Stat. tit. 23, § 15(A). Since a joint tortfeasor in Oklahoma is only liable for the amount of damages allocated to him, the availability of insurance to pay judgments against the Bradshaw Defendants is immaterial from the Millers' perspective. Even if the Bradshaw Defendants failed to pay their share of an award, the Millers would not be answerable for the shortfall.

In sum, American National's effort to join the Millers in this action is futile. *Essex* and *Lott* are directly on point, yet American National neither distinguishes them nor cites any contrary authority. Like the joint tortfeasors in those cases, the Millers have only a theoretical, future interest in whether the policy under consideration covers the claims in the underlying litigation. Such an interest lacks the "immediacy and reality" required to create a controversy fit for declaratory judgment. *See Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011).

**B.     Motion to Defer Consideration**

Defendant Barnes, moving under Rule 56(d) of the Federal Rules of Civil Procedure, asks the Court to defer consideration of American National's motion for summary judgment. (*See* Doc. 26). Rule 56 provides that a district court may permit additional time for discovery if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."

In support of her motion, Ms. Barnes declares as follows:

> 1. Plaintiff has not given Defendant any opportunity to discover any probable facts that would support or justify her opposition to Plaintiff's *Motion for Summary Judgment.*
> 2. Plaintiff filed its *Motion for Summary Judgment* approximately twenty-four (24) hours following the submission of a Joint Status Report.
> 3. Defendant Kathleen Barnes desires to take a deposition of Plaintiff's corporate representative pursuant to Fed. R. Civ. P. 30(b)(6).
> 4. Defendant's counsel estimates that this deposition can be taken within ninety (90) days of the filing of this *Motion.*

(Doc. 26-3). This is insufficient to carry her burden under Rule 56(d).

In order to defer consideration of a motion for summary judgment, the supporting declaration must specify "(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable [the party] to obtain those facts and rebut the motion for summary judgment."

9

*Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015). Here, Ms. Barnes declares that she needs more time to discover facts that would support her opposition to summary judgment, but she does not identify the facts that she needs. She says that she wishes to depose American National's corporate representative, but she does not explain what information she seeks to illicit or how that information would be relevant to the matter at hand.

The issue is whether the claims Ms. Barnes alleged in state court are covered under the policy issued by American National. In order to litigate that issue, Ms. Barnes need look no further than the petition she filed in the underlying action and the policy in question. Since she has both of these documents at her disposal, and she has not explained what other facts are necessary to rebut American National's arguments in favor of summary judgment, the Court sees no reason to defer its consideration.

**C.     Motion for Summary Judgment**

American National urges summary judgment on three points: (1) whether the claims against the Bradshaw Defendants are within the Professional Services Exclusion; (2) whether the Employment Practices Liability Endorsement provides a basis for coverage; and (3), if coverage does exist, whether the policy will cover punitive damages.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id.* If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element

of a claim, all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Id.* at 323. If the movant carries this burden, the nonmovant must "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson,* 477 U.S. at 248; *Celotex,* 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998); Fed. R. Civ. P. 56(e)(2). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler,* 144 F.3d at 671. Although a district court has discretion to go beyond referenced portions of the supporting material, it is not required to do so. *Id.* at 672. The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52.

### 1. Professional Services Exclusion

American National contends that it owes no duty to defend or indemnify the Bradshaw Defendants because the claims against them fall within the policy's Professional Services Exclusion. The policy's liability coverage excludes bodily injury "caused by the rendering or failure to render any professional service." (Doc. 37-3 at 41). The policy does not define professional service but provides that the term "includes but is not limited to" various enumerated services such as "[l]egal, accounting, or advertising services" or "[a]ny health or therapeutic service treatment, advice or instruction." (*Id.*). American National argues that, even though real estate services are not among the enumerated examples, it is nevertheless a "professional service" within the meaning of the exclusion because a real estate agent "likely has a specialized skill and knowledge regarding what disclosures she needs to make" when listing a property. (Doc. 25 at

11

17). Accordingly, because Ms. Barnes's injuries resulted from Ms. Bradshaw's alleged failure to warn of the dog when listing the property, American National says its policy does not cover Ms. Barnes's claims. The Court disagrees.

Although professional service exclusions are frequently litigated, Oklahoma law on the subject is relatively sparse. The Oklahoma Supreme Court has yet to say what a professional service is for insurance purposes, but the state's Court of Civil Appeals has discussed it in the context of both general and professional liability policies. In a case involving a professional liability policy, the court said that the question of whether conduct qualifies as a professional service turns on whether it requires some kind of specialized knowledge.

> The act or service must be such as exacts the use or application of special learning or attainments of some kin[d]. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.

See *Mut. Assurance Adm'rs, Inc. v. U.S. Risk Underwriters, Inc.*, 993 P.2d 795, 798 (Okla. Civ. App. 1999) (quoting *Marx v. Hartford Acc. & Indem. Co.*, 183 Neb. 12, 13–14 (1968)); *see also JP Energy Mktg., LLC v. Com. & Indus. Ins. Co.*, 412 P.3d 121, 128 (Okla. Civ. App. 2017) (adopting the same definition of professional service in the context of a general liability policy).

American National's argument is unpersuasive for two reasons. First, the company merely asserts, without pointing to any evidence, that real estate agents have specialized skill and knowledge regarding disclosures that should be made in a real estate listing. This may well be true, but it is a question of fact that the Court is unwilling to take on faith.

Second, even if some aspects of a listing agent's job require specialized knowledge, the nature of a tortfeasor's occupation is not dispositive when considering a professional service

exclusion. A court "must look not to the title or character of the party performing the act, but to *the act itself.*" *Mut. Assurance Adm'rs*, 993 P.2d at 798 (emphasis added). As explained by a federal court in Indiana, which has adopted a definition of "professional service" nearly identical to the one used by the Court of Appeals in *Mutual Assurance*, "Not every action a professional takes in the course of providing professional services will be a professional service for insurance purposes, but . . . when the professional draws upon his or her professional knowledge, experience, and training in taking some action, that is a professional service for insurance purposes." *Neighborhood Hous. Servs. of Am., Inc. v. Turner-Ridley*, 742 F. Supp. 2d 964, 971 (N.D. Ind. 2010). In other words, the act itself must "involve the use of (or failure to use) professional knowledge, skill, experience, or training." *Id.*; *see also Penn. Nat. Mut. Cas. Ins. Co. v. Roberts Bros.*, 550 F. Supp. 2d 1295, 1306–08 (S.D. Ala. 2008) (applying the same definition of professional services adopted by Oklahoma's Court of Civil Appeals and holding that a property manager's failure to fix a tenant's door was not excluded because the injury was the result of an administrative oversight rather than a professional judgment call).

Here, the omission in question—Ms. Bradshaw's alleged failure to warn of the dog when listing the house—occurred while Ms. Bradshaw was acting in her capacity as a real estate agent, but the allegedly negligent act had nothing to do with the "specialized knowledge" that might make the sale of real estate a "professional service." To the extent real estate agents have special knowledge about what information must be disclosed in a listing, that expertise would seem to concern information that buyers need in order to make an informed, legally binding offer.

*Southern-Owners Insurance Co. v. Herrera*, which American National relies upon, is not to the contrary. *See* 116 F. Supp. 3d 1310, 1311–12 (M.D. Fla. 2015). In *Herrera*, the insured, a real estate broker, allegedly failed to disclose to a homebuyer that her house was built atop a

13

dumping pit. Because the broker was a licensed professional whose alleged misconduct—the failure to disclose a deleterious prior use of the property—fell squarely within the duties specific to his profession, the court concluded that the homebuyer's claims were excluded. *Id.* at 1315.

This case is distinguishable from *Southern-Owners* in several material respects. First, the omission in *Southern-Owners* affected the tort claimant's decision to buy the property, so the injury was directly related to the aim of the professional service in question. Here, the alleged omission had nothing to do with the actual sale of the property. Second, unlike the broker's failure to disclose the property's prior use as a dump, Ms. Bradshaw's alleged failure to disclose the presence of the dog does not relate to any fiduciary duty particular to Ms. Bradshaw's profession. And finally, the broker's omission involved a professional judgment call that implicated the specialized knowledge associated with his occupation. By contrast, it is unclear what special education or training would be necessary to determine whether unsupervised visitors should be warned about the presence of a dog on the property. That would seem to be a matter of common sense, no different than a homeowner's decision to warn the postman by hanging a "beware of dog" sign at the front gate.

In short, American National has come forward with no evidence supporting its claim that real estate agents have special knowledge and skill relating to the information that must be disclosed in a property listing. And, it is far from obvious that such knowledge would be relevant to the kind of disclosure at issue in the underlying litigation. Consequently, American National has failed in its burden to show that Ms. Barnes's claims fall within the professional services exclusion.

2. **Employment Practices Liability Endorsement**

American National also requests summary judgment on the issue of whether the policy's Employment Practices Liability Endorsement applies to any of the allegations or claimed injuries or damages described in Ms. Barnes's petition. The provision in question provides that American

National will cover losses "arising out of an 'insured's' 'wrongful employment act' . . . against [Select Management's] 'employees'." (Doc. 37-2 at 4).

Nothing in Ms. Barnes's petition references any conduct that would meet the policy's definition of a "wrongful employment act." (*See id.* at 12). And none of the allegations mention any injury to an alleged employee of Select Management. Accordingly, the undisputed facts show that the Employment Practices Liability Endorsement provides no basis for coverage of the claimed injuries or damages described in Ms. Barnes's petition.

### 3. Punitive Damages

Finally, American National requests summary judgment on the issue of whether the policy would cover a punitive damages award. In Oklahoma, insurers are generally not liable for punitive damages imposed against their insureds, the rationale being that allowing tortfeasors to shift the burden to an insurer would undermine the purpose of exemplary damages, which is to punish the wrongdoer and deter others from engaging in similar conduct. *See Dayton Hudson Corp. v. Am. Mut. Liab. Ins. Co.*, 621 P.2d 1155, 1158–60 (Okla. 1980). However, an exception exists where the insured has been held vicariously liable for the misconduct of its servant. *Id.* at 1160. Thus, if Ms. Barnes obtains a punitive damages award against Ms. Bradshaw, and her employers are found to be vicariously liable, the punitive damages award against the employers would be insurable.

### III. Conclusion

For the reasons explained above, the Court **denies** the Motion to Defer Consideration (Doc. 26). The Court **grants** the Motion to Dismiss (Doc. 28), except with respect to the movants' request for attorney fees.

The Court **grants in part** and **denies in part** Plaintiff's Motion for Summary Judgment (Doc. 25). The Court denies the motion with respect to the professional services exclusion and

coverage of punitive damages and grants the motion with respect to the Employment Practices Liability Endorsement.

SO ORDERED this 23rd day of March, 2021.

.

_____
JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE